PARMER, Judge.
Alleging undue influence, a personal representative sought to recover the remaining funds then on deposit in financial institution joint survivorship accounts owned at the time of death by the decedent and appellant. The trial judge found that in setting up these accounts the decedent lacked donative intent and did not intend to grant the survivor any interest in the funds on deposit, thereby concluding that the accounts were the subject of undue influence. We reverse.
The facts have a familiar cast. In September 1989, the decedent was an 87 year-old, retired bookkeeper and a widower who had recently lost his spouse after a long term marriage. As he had no children, he turned at first to a nephew to assist him in conducting his affairs, but soon the nephew became very ill and unable to help any further. At this point, decedent decided that two cousins of the deceased wife could help him with his transactions. One cousin was appellant, who lived nearby; the other was a nonresident of Florida. The decedent suggested that he execute two powers of attorney, one for each cousin. The nonresident cousin thought this geographically disadvantageous, owing to her location, so in the end only the power in the name of appellant was used.
Soon afterwards, four joint accounts were opened at Savings of America in the names of both the decedent and appellant, followed two days later by another joint account at BankAtlantic. Decedent also then gave appellant his general power of attorney. One month after that, a joint account was opened at C & S Bank, and she was added as a joint owner to an account at Pruco Securities Corporation. Two months later, he sold his house and the proceeds were placed in two new joint accounts at IDS Financial Services. In short, in a period of four months, all of the subject joint accounts between decedent and appellant were established. All accounts contained an express agreement that the decedent and appellant were joint owners with rights of survivorship and that, upon the death of one, the other would become the sole owner of the funds then remaining in the account.
There is no question that these arrangements had as their initial purpose, in the words of the trial court, “to provide access to monies [sic] in the event they were needed for the decedent’s maintenance and support at a time when he would be unable to act for himself.” There was also no testimony suggesting that decedent harbored any contrary understanding to the import of the survivor-ship accounts — i.e., that appellant would succeed to the ownership of all funds remaining upon his death.
In fact, the evidence is uncontradieted that decedent made all of his own financial decisions throughout this period of time. He alone initiated the process of transferring his assets into joint accounts, without prior consultation with appellant. When he began the process in September 1989, he summoned agents of Prudential Bache to his home and, with both appellant and the nonresident cousin present, raised the subject of making the transfers. The Prudential agent testified that it was clear that it was decedent’s idea and that he fully understood the effect of such a transfer. Representatives of both Savings of America and BankAtlantic testified that decedent did all of the talking, expressed a desire that the accounts be placed in the survivorship form and clearly understood the consequences of so doing. Moreover, the nonresident cousin was present at all of these undertakings, along with appellant.
*1131 It should also be noted that, while appellant suggested Prudential Bache as an institution to place his funds, after meeting with the Prudential Bache agent decedent decided against them. The only other institution suggested by appellant was IDS, but decedent took over the matter after contact with IDS was initiated. Indeed, the IDS agent testified that decedent asked many intelligent and appropriate questions and showed his accounting background. In his presence, decedent even telephoned the nephew, who had previously assisted him in handling his financial affairs, and sought his advice on the IDS transaction.
In sum, the record evidence shows without contradiction that appellant’s only role in establishing the several joint accounts in sur-vivorship form was that when decedent indicated his interest in transferring his funds appellant suggested two possible institutions, one of which he rejected and the other which he alone decided to use, and appellant along with the other cousin of his deceased wife was present for the conferences. The evidence that appellant either procured the transfers, or played any other role in the actual decision to make them, is thus nonexistent.
Decedent had been hospitalized in August 1989, complaining of severe shortness of breath and chest pains. His patient chart describes him as “well oriented,” and the records are filled with entries describing him as alert and cooperative. While they also contain many references to his severe grief and depression from the death of his wife in March 1989, they do not contain any suggestion that his grief impaired or impeded his ability to make personal financial decisions. Indeed, the records show that he struggled to get well; one entry from a dietician reads:
“8-24-89. [Patient] states: ‘I’ve been trying to increase on everything, but I can’t gain any weight. [Patient] admits, T am heavy on the milk, I drink enough to sink a battle ship.’ ”
The August 1989 discharge summary shows him to suffer from congestive heart failure and advanced kidney failure. The doctors recommended that he be placed in a retirement or nursing home, and so he was on 30 September 1989. Upon admission, he told the administrator that he was lonely since his wife had died and that he wanted to be around other people “to get involved in a social life.” In March 1990, he was twice readmitted to the hospital with his heart and kidney failure now severely advanced.
All parties agreed that decedent was competent. In spite of his declining physical health, there is no suggestion in any medical record that he was anything other than alert and comprehending. One doctor recommended in August 1989 that he be seen by a psychiatrist for “pathological” grief and depression, but decedent himself decided against any such treatment. His records contain no indication at any time that he had become mentally unable to decide his own affairs. In fact, after being asked to describe the difference between grief and depression, his regular doctor described his mental condition as normal grief.
He died 31 March 1990. His will had a few small bequests and left the remainder of his estate to the nonresident cousin of his wife and to appellee in equal shares. The will does not mention appellant.
In finding that the establishment of all of the subject joint survivorship accounts was tainted by the undue influence of appellant, the trial court reached its decision by the following analysis. The court first decided that “[t]here is substantial evidence to support a finding that the decedent lacked the requisite donative intent [to make a gift of the joint account funds at his death to appellant].” [1] Next, observing that the decedent had been totally dependent on his wife for maintaining his home and preparing his meals, the court noted that appellant “would drive the decedent back and forth to all necessary appointments.” As the court de *1132 scribed it, in decedent’s deteriorated physical and emotional state:
“[appellant] was placed in a clearly superi- or position and was able to exert a large degree of influence upon decedent’s decisions. The decedent virtually became totally dependent upon [appellant] for his day to day needs and afforded undue weight to her advice and persuasions.”
Actually the uncontradicted evidence shows that the nursing home supplied his day-today needs, and appellant’s role was limited to driving him to doctors’ and financial appointments.
The court brushed aside the fact that appellant had not procured the transfers or joint account survivorship arrangements, saying:
“Although both the decedent and the decedent’s family had initially wished [appellant] to become involved with his financial affairs, [appellant] went beyond her intended role of fiduciary and used her position to secure her permanent control over the large majority of the decedent’s assets.”
Again, the evidence shows without contradiction that it was solely decedent’s decision — usually only after consultation with a number of people — to place these accounts, which certainly amounted to nearly 90% of his assets, into a survivorship form with appellant.
' Then, to illustrate that the accounts had been established through the “direct efforts” of appellant, the court noted that she “would either escort the decedent to the bank to effectuate the changes or meet at his home for him to sign the necessary documentation.” The court also emphasized that appellant had suggested IDS (when decedent was searching for depositories that would maximize the interest return), and that appellant had used her “boyfriend” in carrying out the sale of decedent’s house and car after he had moved to the nursing home.[2]
The court concluded its analysis by saying:
“By guaranteeing that the bulk of the decedent’s belongings were under her direct control, she made herself an indispensable part of the decedent’s life resulting in his transferring nearly 90% of his estate to her within a four month period of time. Although she never considered the assets contained in the joint accounts to be hers during the decedent’s lifetime, and although she knew that decedent’s family simply wished for her to act in a fiduciary capacity, [appellant] clearly had no intention of relinquishing her hold on the assets upon decedent’s passing. The decedent’s lack of donative intent is clear and the defendant simply used her position to her own benefit.” [e.s.]
From this conclusion, the court held that appellant was guilty of undue influence and that the joint survivorship accounts should be deemed to be part of decedent’s probate estate. The court required appellant, as the constructive trustee of all remaining funds in the accounts at death, to file an accounting. From the final judgment, she appeals.
Some months after the court entered the final judgment, the supreme court decided In re the Estate of Combee, 601 So.2d 1165 (Fla.1992), which involved facts and issues similar to those here. We take special note that the district court of appeal decision in Combee[3] was cited to the trial court in this case as authority in favor of appellant. The trial court here distinguished the district court decision in Combee, however, and relied instead on In re the Estate of Gainer, 579 So.2d 739 (Fla. 1st DCA 1991). In Gainer, the joint account holder testified that all funds in the account were decedent’s during her lifetime and that the holder would not have made a claim against her estate if decedent had withdrawn all the funds from the joint account during her lifetime. The district court held that the joint account holder’s testimony was inconsistent with a completed gift under the common law elements. Moreover, the court held that the decedent’s will was contrary to any donative intent as to the funds in the joint survivorship accounts. 579 *1133 So.2d at 741. After discussing Gainer and Combee, the trial court explained that there was clear and convincing evidence here that the decedent did not intend for the bank accounts to vest in appellant at the time of his death. The trial court also noted that there was no contention of undue influence in Combee, as the court concluded there was in the present case.
As to the supreme court’s later analysis in Combee, after reviewing the history of joint survivorship accounts in the cases and statutes, the court made clear that section 658.-56, Florida Statutes (1989),[4] had eliminated any former requirement of showing a gift inter vivos when such an account is created. 601 So.2d at 1166-67. First, as the court pointed out, section 658.56(1) creates a statutory presumption that the creator of the. joint account intended that all funds become the sole property of the joint account holder upon the death of the depositor.
As the court put it: “[t]he presumed intent is not an intent to make an inter vivos gift but rather an intent that the remaining account holders receive the funds remaining in the account when the depositor dies.” 601 So.2d at 1167. The court held that, even without donative intent and even though testamentary in nature, the statutory presumption of section 658.56(1) prevails. The court thus agreed with the district court that the legislature intended that the problem be resolved under a contract theory rather than the former theory relating to gifts.
The court then proceeded to analyze the evidence recited by the district court. In concluding that the district court had not erred in reversing the finding of the trial court, Justice Grimes wrote:
“Applying the law as we interpret it to the foregoing facts, it is evident that the petitioners fell far short of their burden of rebutting the statutory presumption by clear and convincing evidence. While the evidence may not have supported a gift inter vivos, this is no longer relevant. There is virtually no evidence which would indicate that [the decedent] did not intend for [the joint holders] to receive the funds which remained in the accounts at her death. [Decedent’s] expressed intent to provide for her grandchildren does not evince a contrary intent because she left ample assets in the estate which can be liquidated for that purpose. The fact that the earlier personal representative viewed his position in a different light does not demonstrate [the decedent’s] intent, particularly when his role in helping her during her lifetime was much different than that of the respondents.” [e.s.]
Combee, 601 So.2d at 1169. The court then approved the district court decision and disapproved Gainer to the extent of any inconsistency. In this case, the trial court followed Gainer and found the lower court decision in Combee inapposite.
It must now be apparent that the trial court’s reliance on the lack of donative intent is misplaced. Even if it could be said from the testimony and evidence adduced that do-native intent was not proven, that would not suffice to prove an intent contrary to the presumption created by the joint survivor-ship accounts. First, the mere fact that there was no evidence as to whether decedent intended to make a gift to appellant when he executed the joint survivorship accounts would not tend to prove the entirely separate matter as to whether he intended the funds on deposit at the moment of his death to go to the joint holder. That he did intend the latter is presumptively established by his creation of the survivorship account. Second, a contrary intent to the survivorship had to be proven by clear and convincing evidence. The mere absence of the one intent could not logically be imagined even by the most dedicated advocate into clear and convincing proof of the other intent.
Nor can we place any weight on what decedent’s family intended, which is clearly irrelevant to what he intended. Similarly, his failure to name appellant as a taker under his will proves little. To the contrary, the reasonable inference to be drawn from her absence in the will is that it may simply *1134 reflect his knowledge that she will take the funds remaining in the joint survivorship accounts when he dies, itself a permissible form of testamentary disposition. Also unavailing, as we know from Combee, is the fact that she did not deem the funds hers during his life. Equally irrelevant is the fact that upon his death she did claim the funds as hers; for that is, after all, precisely what the survivor-ship accounts were designed to accomplish. Therefore, we conclude that it was error for the trial court in its final judgment here to decide the issue on the basis of donative intent. We thus turn to the issue of undue influence.
Under Florida common law, a presumption of undue influence arises only when there is a confidential relationship between the decedent and the recipient, and the recipient has actively procured the transfer. In re the Estate of Carpenter, 253 So.2d 697 (Fla.1971). The verb “procure” means: “[t]o get by special effort; [to] obtain or acquire * * *; [t]o bring about; [to] effect * * American Heritage Dictionary of the English Language 1445 (3rd ed. 1992). Carpenter suggested several factors that might support a finding of active procurement: (1) the presence of the beneficiary at the execution of a will or on the occasions when the testator expressed a desire to make a will; (2) recommendation by the beneficiary of an attorney to draw the will; (3) knowledge of the contents of the will by the beneficiary before the execution; (4) the beneficiary instructing the attorney drawing the will; (5) the beneficiary securing the witnesses to the will; and (6) the beneficiary has the will for safekeeping after the execution. 253 So.2d at 702.
Most of these factors are of doubtful applicability to this case, for the transfers here involve joint survivorship accounts rather than a will. In the case of joint survivor-ship accounts, however, the joint account holder will almost always be present when the account papers are executed and the accounts are discussed because these are joint accounts. Of necessity there will be two or more people present to sign relevant documents. Thus, merely being “present at the creation” (to use Dean Aeheson’s felicitous phrase) of joint survivorship accounts is insufficient by itself to quicken a case of undue influence into vitality.
Merely driving the decedent to and from his bankers, without more, is insufficient evidence of procuring these joint accounts. It is also clear that even if merely suggesting possible institutions, as appellant did, had any initial meaning along the lines of procurement, decedent’s actions and conduct in rejecting the one and alone selecting the other erase any invidious connotation. Here there is no .evidence that appellant played any role in procuring the transfers. Rather, all the evidence shows that it was decedent who actively procured them.
Hence, there was no necessity for appellant to come forward with a reasonable explanation as to her conduct in decedent’s affairs, as Carpenter requires after the presumption has been validly implicated, because here the facts do not support a prima facie case for undue influence. Where the record evidence does not support a presumption of undue influence, there is nothing for the party to rebut and the issue should be decided as a matter of law against the proponent of the undue influence claim. In this case, viewing the evidence in a light most favorable to the appellees, we conclude that it was insufficient to establish clearly and convincingly an intent contrary to the surviv-orship provision in the joint account agreements.
REVERSED AlND REMANDED FOR CONSISTENT PROCEEDINGS.
WARNER,[5] J., concurs.
STONE, J., dissents with opinion.

. The trial court noted that decedent was frugal and rarely gave gifts, and that the decedent never directed his long time attorney to file a federal gift tax return when the joint accounts were established, although his attorney gave no testimony to that effect. Nor did the attorney ever suggest in his testimony that it would have been necessary to file a gift tax return when the joint survivorship accounts were established.

. The house was listed with a realtor who was a friend of the boyfriend. There was no suggestion of any impropriety in the boyfriend's role in either transaction.

. In re the Estate of Combee, 583 So.2d 708 (Fla. 2d DCA 1991).

. See also § 665.063, Fla.Stat. (1989). Both section 658.56 and section 665.063 have since been replaced by a single unified section applying to all financial institutions and survivorship accounts. See Ch. 92-303, § 48, Laws of Fla. [now codified as § 655.79, Fla.Stat. (1993)].