STONE, Chief Judge.
We affirm an order rejecting Appellants’ petition to set aside certain inter vivos transactions. The trial court did not err by failing to apply' the dead man’s statute, § 90.602, Fla. Stat. (1995), to testimony on behalf of Appellee/Beverly Guido as to communications with the deceased regarding certain completed transactions which Appellants claim were procured by fraud and undue influence.
Appellants are siblings of the decedent, John Stetzko. Under the decedent’s will, Appellee receives half of the estate and Appellants, the other half. The estate was substantially diminished by a series of inter vivos transfers several months prior to John’s death. This court has previously affirmed an order denying Appellants’ claim that the will was procured by undue influence and duress. Appellants now attack the inter vivos transfers. The final order was entered following a full evidentiary hearing.
Appellants allege that Beverly obtained a portion of Decedent’s assets by transferring joint assets into her individual name. Appellants also allege that the transfers were obtained as a result of Decedent’s diminished capacity resulting from his failing health. Decedent suffered from cancer.
The record supports a conclusion that Decedent had an acute awareness of the nature of his assets and that he was in sound mind when he transferred assets to Beverly. Decedent had no children of his own and Beverly maintained a very close relationship with Decedent and his wife throughout their lives, akin to that of parents and a daughter. Beverly cared for Decedent’s wife during the years prior to her death, and cared for Decedent prior to his death much in the way that a child would care for parents. Beverly alleges that Decedent began divesting himself of certain assets in order to avoid probate, and to intentionally provide Beverly with the bulk of his wealth. Decedent’s siblings were quite elderly, and Decedent allegedly felt that Beverly would make better use of the money. Beverly also presented evidence showing that Decedent handled all of his own affairs, and lived an independent and active life up until the week he died. For example, Decedent was actively involved in the preparation of all of his own tax returns, paid his own bills, and generally was able to take care of his own finances.
Appellants allege that the trial court erred by allowing Beverly and her husband Gene to testify as to oral communications they had with Decedent. Section 90.602, Florida Statutes, provides in relevant part:
(1) No person interested in an action or proceeding against the personal representative, heir at law, assignee, legatee, devi-see, or survivor of a deceased person, ... *1089 shall be examined as a witness regarding any oral communication between the interested person and the person who is deceased or mentally incompetent at the time of the examination.
(2) This section does not apply when:
(a) A personal representative, heir at law, assignee, legatee, devisee, or survivor of a deceased person, ... is examined on his or her own behalf regarding the oral communication.
(b) Evidence of the subject matter of the oral communication is offered by the personal representative....
The court permitted Beverly and her husband Gene to testify concerning oral communications that allegedly occurred with Decedent.[1]
Appellants waived the dead .man’s statute because they chose to introduce certain evidence concerning various inter vivos conveyances and transfers, including bank records establishing the creation of joint and several bank accounts, life insurance, beneficiary designations, and deeds to real property. Further, Appellants called Appellee and questioned her about these matters, omitting only questions of oral communications with Decedent.
*1090 Section 90.602(2)(b) clearly states that the dead man’s statute does not apply when “evidence of the subject matter of the oral communication is offered by the personal representative.” Because Appellants, in proving their case in chief, introduced evidence of the subject matter of the oral communications, i.e., bank records, life insurance policies, the real estate deed, the statute does not apply. See Briscoe v. Florida Nat’l Bank of Miami, 394 So.2d 492 (Fla. 3d DCA 1981).
In Briscoe, the Third District found that the introduction of certain bank records constituted a waiver of the dead man’s statute. We recognize that at the time Briscoe was decided, a different version of the dead man’s statute was in effect. This earlier version of the statute barred testimony by an interested person as to any communication or transaction with the decedent. See former F.S. § 90.05 (1975). The version of the statute applicable to the instant case applies only to testimony relating to oral communications. F.S. 90.602. However, we find the reasoning of Professor Ehrhardt persuasive that the result in Briscoe would have been the same under the present version of the statute. See Charles W. Ehrhardt, Florida Evidence § 602.1 at 358-59 (1997 ed): Professor Eh-rhardt found that:
The court would have reached the same result if the case had been decided under section 90.602(2)(b) because, when the personal representative elected to introduce the letter and card, the personal representative offered “evidence of the subject matter of the oral communication.” This construction of section 90.602(2)(b) probably means that in most, if not all, will contests, the statute will be waived because the person attempting to uphold the will must first introduce it and show that it was properly executed. Similarly, in other contests where a protected person must first prove an inter vivos act, section 90.602(2)(b) waiver will likely result. If the statute is applicable and can be claimed by the protected party in a will contest, e.g., an heir, the presumption of undue influence may be almost impossible to overcome, since the interested person’s lips will be sealed.
Id. See also Moneyhun v. Vital Indus., Inc., 611 So .2d 1316, 1320 (Fla. 1st DCA 1993) (even if section 90.602 was applicable, its protection was waived when the protected party relied on evidence of the subject matter of an oral agreement to argue in a pretrial motion that the action was barred by the statute of frauds and statute of limitations).
Appellants also assert that the trial court erred in holding that they failed to raise a presumption of undue influence. The supreme court held in In re Estate of Carpenter, 253 So.2d 697 (Fla.1971), that because of the difficulty of obtaining direct proof in cases where undue influence is alleged, contestants can satisfy their burden initially by showing sufficient facts to raise a presumption of undue influence. A presumption of undue influence arises when a person who is the primary beneficiary of a will (1) had a confidential relationship with the testator, (2) actively procured the bequest, and (3) the first two requirements existed at the time the subject actions occurred. Id.; see also Fogel v. Swann, 523 So.2d 1227 (Fla. 3d DCA 1988) (applying Carpenter undue influence presumption to inter vivos transfers). Once these three requirements are met, the burden shifts to the respondent to come forward with a reasonable explanation. The trier of fact is vested with the discretion to determine whether or not the facts show active procurement or a confidential relationship. Carpenter at 701. The court here found that Appellants failed to raise a presumption of undue influence.
Appellants point out that Beverly is named as the personal representative in Decedent’s will, was his pre-need guardian since 1990, and that Decedent lived with Beverly. Furthermore, even before he moved in, Beverly cooked for Decedent and accompanied him to all of his doctor appointments. Although this may be sufficient to establish a confidential relationship, Appellants must also establish that Beverly actively procured her inter vivos gifts. With respect to the joint bank account, Beverly points out that Decedent did not even begin living with her until January 1995, almost 11 months after the joint account was created. In Davis v. *1091 Foulkrod, 642 So.2d 1129 (Fla. 4th DCA 1994), the court held:
[T]he mere fact that there was no evidence as to whether decedent intended to make a gift to appellant when he executed the joint survivorship accounts would not tend to prove the entirely separate matter as to whether he intended the funds on deposit at the moment of his death to go to the joint holder. That he did intend the latter is presumptively established by his creation of the survivorship account.
Id. at 1133.
This court further noted in Davis that merely being present at the creation of the joint bank account or driving the decedent to and from the bank, without more, is insufficient evidence of procuring the account.
Appellants also challenge Decedent’s change of beneficiary on an annuity to Beverly. Beverly testified that this transaction took place during a dinner party at her home where the only people present were Decedent, Beverly, her husband, and Charlotte Capp, Beverly’s mother. Beverly’s husband and mother signed as witnesses to this transaction. We have considered Blades v. Ward, 475 So.2d 935 (Fla. 3d DCA 1985). However, in Blades, the granddaughter was active in procuring a will and failed to come forward with any reasonable explanation of her active role in the testator’s affairs. During the time in question, the testator was a double amputee, was completely blind, and required assistance to feed herself, to bathe, to get out of bed, and to go to the bathroom, and it was the granddaughter who invited the notary public to the party at which the will was changed. None of the relatives of the decedent were made aware that a new will was being executed. Finally, following the decedent’s death, it was the granddaughter who produced the will for probate. The court found that, all of these facts taken together were sufficient to raise an inference of active procurement.
Here, unlike the situation in Blades, Decedent was not an invalid at the time he changed the beneficiary on this policy. In fact, Decedent was not even diagnosed with cancer until March 1995, and the contested events occurred in December 1994. At this point, Decedent was still in excellent health, taking care of all of his personal affairs, and was not -at all dependent on Beverly. Although there was some evidence that Decedent may have been confused and had some memory problems in the last week of his life, there was no evidence that Decedent’s mental problems had manifested themselves this early. Thus, this case is distinguishable from Blades and it was not an abuse of discretion to fail to find a presumption of undue influence in this situation.
In a third contested transaction, Decedent quit claimed his house to Beverly in March of 1995, about two months before he died. The transaction occurred at a local title company. When the house was sold, Beverly deposited the proceeds of the sale ($76,308) into her individual account.
Appellees also contest the execution of two joint certificates of deposit, with Beverly, that were funded in January and February of 1995. Prior to his death, Beverly closed the joint CDs and deposited all of the proceeds into her- individual bank account. There is evidence that Decedent was healthy and handling his own affairs until just a few weeks before he died, and that these transactions occurred prior to his suffering mental confusion.
Beverly explained that there were several reasons why Decedent made this and other inter vivos transfers to her. On numerous occasions Decedent stated that he wanted as little as possible to pass through probate in ortjer to avoid additional expense and delays, and he wanted to repay Beverly for her years of care. Beverly provided daily care for Decedent’s wife while she suffered from terminal cancer, and Beverly provided similar care for Decedent. Decedent had no children of. his own and considered Beverly to be like his daughter. Furthermore, Decedent’s siblings were quite elderly. Thus, Decedent felt that Beverly would have a greater opportunity to enjoy the money. In addition, Decedent’s siblings were not totally forgotten. Not only did they receive half of the proceeds of the estate, but they also received the benefits of several inter vivos transfers totaling $110,316. The net result of the dis *1092 tribution of the assets was that Beverly received approximately 76 percent of the gross estate, and Appellees received approximately 20 percent, with the balance to be divided equally after the deduction of applicable costs. Given the relationship of the parties, the court could conclude that the distribution of the assets was entirely reasonable.
Therefore, the judgment is affirmed.
PARIENTE, BARBARA J. and KARLAN, SANDY, Associate Judges, concur.

. For example, Beverly testified as follows:
Q. Did your Uncle John ever tell yon why he wanted you to have the bulk of his estate? A. Yeah, he ...
******
Q. Why did he say he wanted you to have the bulk of his estate?
A. He said nobody could talk about you and put you down in my eyes. He said you proved yourself, what you did for my Mary, nobody better, ever tty it, and if they do, I'll fix them, and he was very appreciative what I did.
In regard to Decedent's moving in with Respondents, Beverly testified that Decedent, "said he was relieved to be with me in my home because that way no one could come and pressure him and force him to leave Florida, and me and my Aunt Mary. In my home, he felt protected.” Additionally, the court allowed Beverly to testify as to Decedent’s alleged statements concerning the certificates of deposit that Beverly transferred from a joint account in her and Decedent's name into her name individually:
He told me to go. He said he didn't want this to stay that way. I said I don’t know why, and he said because of what was happening in this past year, there was going to be problems, and if this is left in there, even though I get it at the end, there’s going to be problems. He was afraid that it was going to get eaten up in court.
In regard to Decedent’s transfer of his house to Beverly, the court allowed the following eolio, quy;
Q. Did he say anything to you about the deed later that day?
A. He said it was what my aunt wanted.
Q. When did he say that?
A. In the car coming home.
Q. How about was there any other discussion after it was done?
A. No....
Concerning placing her name on Decedent’s joint bank account, Beverly testified to the following:
My uncle explained to me he- had my aunt Maty’s name on his account, even though she was dead he had her name on the account right up until he put miné on.- So he said he wants me on both accounts. He told the woman. He said — she asked him who Mary was. He said that’s his deceased wife.
He said to me, in front of the woman, that I took care of my aunt for eight months with lymph node cancer, everything, the household, everything. He said he would — couldn’t—he couldn’t thank me enough.
He said my aunt and him talked before she died, that they decided that I was going to be most — I guess they’re going to give me something, the most, and he said your Aunt Mary didn't get to enjoy it. She wanted you to have it, and that’s how this came about, and then it had her name on it.
Additionally, over the objection of Appellants’ trial counsel, the court allowed Gene to testify as to the following:
Q. Okay, Mr. Guido, during the petitioner's case, there was testimony concerning certain checks which you received from Mr. Stetzko and that you thereafter deposited into a bank, do you recall that testimony?
A. Yes, I do.
Q. Okay, and in each case where you received those checks, did the decedent provide you instructions as to what to do with those checks?
******
A. Did he provide you with instructions?
A. Yes.
Q. What were his instructions?
A. John Stetzko was living with us beginning January 1995. He didn’t have a car for a period of time beginning January 1995. As these checks were coming in from various sources, he knew that I was going to the office very day and asked me to do him a favor:, to please make these deposits on his behalf.